No. 65,076

STATE OF KANSAS, *Appellee*, v. CHEUN-PHON JI, *Appellant.*

(832 P.2d 1176)

Opinion filed May 22, 1992.

*Cortland E. Berry*, of Cortland E. Berry Legal Clinic, of Reading, argued the cause and was on the brief for appellant.

*Rodney H. Symmonds*, county attorney, argued the cause, and *Robert T. Stephan*, attorney general, was with him on the brief for appellee.

*Per Curiam*: Cheun-Phon Ji was charged, tried, and convicted of one count of first-degree murder and six counts of attempted first-degree murder. Ji was sentenced to a term of life imprisonment on the murder conviction and terms of 10 years to life on the six attempted first-degree murder convictions. All sentences were to run consecutively. Ji appeals, claiming multiple errors and requesting a new trial.

Ji, a person of Chinese descent, was born and raised in Taiwan. After receiving his undergraduate degree, Ji served for approximately two years as an officer in the Taiwanese Army. In January 1983, Ji came to the United States to obtain a graduate degree. In 1984 he received a graduate degree from Emporia State University, Emporia, Kansas.

While attending Emporia State, he met G.M., whom he dated for 2-3 weeks. During this time, Ji attended a Bible class at the Calvary Baptist Church in Emporia with G.M. Ji was infatuated and became obsessed with G.M. She ended the relationship with

Ji, apparently with little explanation. Ji became obsessed with the belief that he was being persecuted by whites and that one or more members of the Calvary Baptist Church may have been responsible for G.M.'s termination of their relationship.

After receiving his graduate degree, Ji went to Los Angeles, where he worked for approximately three months. In March 1985, he went to New York City to work. Eventually, he returned to California and, in March 1988, left California for Emporia, Kansas. After spending the night of Saturday, March 5, 1988, in Wichita, Ji drove to Emporia on Sunday morning.

At approximately 11:00 a.m. Ji entered the back of the Calvary Baptist Church in Emporia, where more than 100 persons were attending church. Ji set his duffel bag on the floor, slipped a clip into a 9mm semi-automatic handgun and fired 15 rounds into the congregation. After Ji fired the 15 rounds, Jerry Waddell, a member of the congregation, saw that the weapon appeared to be empty and immediately ran towards Ji. Ji turned and ran out of the church, trying to reload his pistol, while pursued by several members of the congregation. Waddell threw a hymnal which struck Ji on the back of the head, causing him to slow. Waddell tackled Ji. Ji was held by members of the congregation until the police took him into custody.

One person died as a result of the shooting and four others were wounded. The two others Ji fired at were not hit.

Prior to trial, Ji's appointed counsel included W. Irving Shaw (March 7, 1988-February 3, 1989), Neil Roach (February 3, 1989-March 23, 1989), Jeff Larson (March 23, 1989-September 19, 1989), and Kym Myers (September 19, 1989-November 16, 1989). Ji's counsel on appeal, Cortland E. Berry, was also trial counsel. Berry was appointed to represent Ji on November 16, 1989.

Other facts appear as necessary for a resolution of the issues.

1. Challenge to the composition of the jury and failure to discharge the jury panel.

Ji first contends it was error for the district court to refuse to consider his motions challenging the composition of the jury venire and to discharge the jury panel. Trial commenced on Wednesday, January 17, 1990, and ended on Wednesday, January 24, 1990, with a two-day break for the intervening weekend.

Prior to 5:00 p.m. on the day before the commencement of his jury trial, Ji filed motions challenging as unconstitutional (1) the jury selection process which excludes aliens and foreign students as jurors, (2) the statutory exclusion of illiterates, and (3) what he contends is the statutory exemption of handicapped persons from the jury. Just prior to selecting the jury, Ji filed an additional motion, to discharge the jury panel.

The district judge found the motions were not filed in accordance with the requirements of K.S.A. 22-3407(1), which provides:

"Any objection to the manner in which a jury panel has been selected or drawn shall be raised by a motion to discharge the jury panel. The motion shall be made at least five days prior to the date set for trial if the names and addresses of the panel members and the grounds for objection thereto are known to the parties or can be learned by an inspection of the records of the clerk of the district court at that time; in other cases the motion must be made prior to the time when the jury is sworn to try the case. For good cause shown, the court may entertain the motion at any time thereafter."

After denying the motions, the court allowed defense counsel to argue why the motions could not have been filed within the time specified by 22-3407.

Defense counsel argued the time required for research and investigation made it impossible for the numerous motions to be filed as required by 22-3407. Ji asserted it was just a week prior to trial that the court ordered the court clerk to cooperate with defense counsel in gathering information necessary for the motions to challenge the jury panel and the selection process.

The trial court noted that the names of the prospective jurors were known on January 8, 1990. The method for selection of the panel from the voter registration list had been in use for a considerable period of time. The trial court found that Ji had had sufficient time to comply with K.S.A. 22-3407 but had not shown good cause why the motions could not have been filed earlier, and it denied the motions.

Kansas law provides that no person shall be excluded from service as a grand or petit juror in the district courts of Kansas because of race, color, religion, sex, national origin, or economic status. Every juror, grand and petit, shall be a citizen of the

state and a resident of the county and possess the qualifications of an elector. K.S.A. 43-156. Jury commissioners are to prepare a list of persons qualified as jurors in each county from voter registration records of the county, lists of licensed drivers residing in the county, or enumeration or census records for the county. K.S.A. 43-162.

On appeal, Ji argues that blacks, Hispanics, and young adults who traditionally fail to register to vote, and aliens and foreign students who are denied the right to vote, constitute cognizable, distinctive classes of persons in the community who are unconstitutionally excluded from the pool. He bases his argument on a quotation from *Taylor v. Louisiana*, 419 U.S. 522, 538, 42 L. Ed. 2d 690, 95 S. Ct. 692 (1975), which states: "[J]ury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof."

We note the quotation is taken out of context. The full paragraph reads:

"It should also be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition [citations omitted]; but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." 419 U.S. at 538.

In *State v. Campbell*, 217 Kan. 756, 766-767, 539 P.2d 329 (1975), this court considered whether a jury list prepared from voter registration records was unconstitutional. The court held that the use of voter registration records as the sole source of names of prospective jurors results in juries selected from a fair cross section of the community and is not statutorily or constitutionally invalid. The *Campbell* case was decided subsequent to *Taylor v. Louisiana*, which was discussed in *Campbell*.

We disagree with Ji's claim that the jury panel, as drawn, systematically excluded distinct groups in the community. The use of the voter registration list which excludes aliens, foreign students, and those who fail to register to vote does not violate the United States or Kansas Constitutions.

Ji further asserts that the K.S.A. 43-159 permissive exemption from jury service of all handicapped persons is unconstitutional because there is no sufficient state interest to justify the exemption.

The right of the court to excuse a juror is statutory. K.S.A. 43-159(d) allows persons who are not disqualified for jury service for whom jury service would cause extraordinary or compelling personal hardship to be excused from jury service by the trial judge. K.S.A. 43-159(d) does not automatically exempt handicapped persons from jury service, as Ji contends. The difficulty with this assertion is that the defendant has presented no evidence whatsoever that persons with extraordinary or compelling hardship, e.g., certain handicapped persons, were excused from jury service. In a motion challenging the jury panel, the moving party has the duty to go beyond a bold claim that the jury panel was improperly selected or drawn. *State v. Coy,* 234 Kan. 414, Syl. ¶ 2, 672 P.2d 599 (1983).

K.S.A. 43-158(a) provides that persons unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out a jury questionnaire form shall be excused from jury service. Ji asserts the exclusion under 43-158(a) of persons who cannot read or write as potential jurors discriminates against those who are illiterate and is unconstitutional.

In *State v. Folkerts,* 229 Kan. 608, 612, 629 P.2d 173, *cert. denied* 454 U.S. 1125 (1981), the court noted that K.S.A. 43-158 requires that certain persons "*shall* be excused from jury service" and then lists persons unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out a jury questionnaire form; persons under adjudication of incompetency; and persons who within 10 years immediately preceding have been convicted of or pleaded guilty, or nolo contendere, to an indictment or information charging a felony, and concluded these three categories of persons are those who, for obvious reasons, would be unfit to serve as jurors. The court asserted it is apparent that a person in any one of the categories could be constitutionally excluded from jury service.

The right to vote and the privilege and qualification to serve as a juror are not correlative or necessarily coexistent. The right to vote and serve as a juror may have some common require-

ments—but one who is qualified to vote may not be qualified to serve as a juror. Jurors must have a reasonable knowledge of the language in which the proceedings are conducted to enable them to perform their duties and to ensure the defendant receives a fair trial. We disagree with the defendant's assertion that a distinct class of persons in the community was constitutionally excluded from the jury panel. Under the circumstances, the trial court did not abuse its discretion in denying the motion.

On appeal, Ji argues he was not given an opportunity to present these claims because the judge found K.S.A. 22-3407 required the motions to be filed at least five days prior to the date set for trial. He contends that after the court granted his motion to discover the composition of the petit jury pool on January 8, 1990, he promptly obtained the necessary information from the clerk on how the panel was selected and what source was utilized to provide a source of names. Defense counsel asserts that by January 12, 1990, he had gathered the information required to argue the motions, but it was then impossible to file the motions five days before trial.

K.S.A. 22-3407 considers only the impropriety in selecting the jury panel. The motion to discharge the whole panel must state facts constituting grounds for granting the motion. The motion challenging the manner in which a jury panel has been selected or drawn must be raised at least five days prior to the date set for trial unless good cause is shown. The test on appellate review of whether the trial court abused its discretion in denying the defendant's out of time request to file a challenge to the selection of the jury is whether no reasonable person would agree with the trial court. If any reasonable person would agree, appellate courts may not disturb the trial court's decision. *Hoffman v. Haug*, 242 Kan. 867, 873, 752 P.2d 124 (1988). We have reviewed each of the defendant's assertions against the selection of the jury panel. The district court did not abuse its discretion.

2. Ji's other pretrial motions.

On the day before the jury trial was to commence, Ji filed additional motions to (1) individually voir dire the prospective jurors, (2) sequester the jurors during voir dire and throughout trial, (3) dismiss the complaint/information because of the arbitrary

use of prosecutorial discretion in the plea bargaining process, and (4) authorize Ji to obtain the services of a jury selection or communication specialist to assist counsel during voir dire.

Between 8:36 a.m. and 9:00 a.m. on January 17, 1990, the morning of the trial, the trial judge denied Ji's motions for individual sequestration during voir dire and sequestration of jurors during voir dire and throughout trial as not appropriate or necessary and the motion to dismiss the complaint because of arbitrary use of prosecutorial discretion as not well made. The court did grant Ji's motion to obtain a jury selection specialist if it would not delay the trial or the selection of the jury, which was to begin at 9:00 a.m. that morning.

Ji contends his motions to voir dire the jury panel individually and for sequestration of the jury during voir dire and throughout trial should have been granted by the trial court. Ji contends that without voir dire of isolated individual prospective jurors, he was unable to exercise his challenges for cause and peremptory challenges in an intelligent and informed manner.

In the absence of a showing of an abuse of discretion which has prejudiced defendant's substantial rights, the ruling of the trial court will not be disturbed. *State v. Baker*, 227 Kan. 377, 383, 607 P.2d 61 (1980). Ji has neither shown that he was unable to exercise his challenges in an intelligent and informed manner nor demonstrated any prejudice because of the denial of individual voir dire or the failure to sequester during voir dire. He does not brief the issue of sequestration of jurors during trial and that issue is deemed abandoned.

Although Ji's defense attorney was a competent trial lawyer, he was not proficient in the techniques of jury selection in such a highly publicized case. Defense counsel believed a jury selection specialist would be able to spot prospective jurors' subconscious nonverbal behavior indicative of a verbal message never stated. As noted, the motion to obtain the jury selection specialist was filed the day before the trial. The trial court heard the motion the morning of the trial and advised defense counsel that although it would permit him to utilize such a specialist if one were available, it would not delay the start of the trial. Ji argues the district court abused its discretion by failing to delay the trial until a jury selection specialist could be obtained to assist defense coun-

sel. In essence, Ji contends that the trial court actually denied the motion to obtain the services of a jury selection specialist.

The authorization of supporting services in the criminal trial of an indigent defendant is a matter which lies within the sound discretion of the trial court, which decision to deny services will not be disturbed unless the defendant shows prejudice to his or her substantial rights resulting from abuse in the exercise of discretion. *State v. Reynolds*, 230 Kan. 532, 534-35, 639 P.2d 461 (1982). The jury trial commenced at 9:00 a.m on January 17, 1990. Both parties had passed the panel for cause and exercised peremptory challenges by 12:30 p.m. that day. Ji has neither shown nor demonstrated that any prejudice or harm resulted because there was no jury selection specialist present to advise counsel during the jury selection.

Ji next contends the trial court did not consider his motion to dismiss the complaint/information because of the arbitrary use of prosecutorial discretion in plea bargaining by the county attorney. In essence, Ji claims the complaint filed against him should have been dismissed because the prosecutor refused to plea bargain. His argument is that the county attorney's arbitrary use of prosecutorial discretion was a factual question which the trial court improperly refused to examine. Ji cites no authority for this contention.

The discretion whether or not to prosecute has long been the sacred domain of the prosecutor and stems from the common-law practice of nolle prosequi. A nolle prosequi is a formal entry of record by the prosecuting attorney by which the prosecutor declares an unwillingness to prosecute a case or that he or she will not prosecute a suit further. 21 Am. Jur. 2d, Criminal Law § 512. It has generally been held that in the absence of a controlling statute or rule of court, the power to enter a nolle prosequi before the jury is empaneled and sworn lies in the sole discretion of the prosecuting officer. 21 Am. Jur. 2d, Criminal Law § 514. Similarly, in the absence of a statute which requires a prosecutor to plea bargain, whether or not to plea bargain with an individual charged with a crime lies in the discretion of the prosecutor. The prosecutor's refusal to plea bargain with Ji does not require that the case be dismissed.

The following three issues deal with claims of ineffective assistance of counsel. As more fully set out below, Ji claims that his counsel was ineffective (1) during voir dire of the jury or in his use of peremptory challenges, (2) in failing to timely file motions to suppress illegally seized evidence and statements made by Ji after his arrest, and (3) in failing to have Ji's experts evaluate Ji using the proper legal standard for insanity in the state of Kansas.

The rules pertaining to this court's review of claims of ineffective assistance of counsel are clear. A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Chamberlain v. State*, 236 Kan. 650, Syl. ¶ 3, 694 P.2d 468 (1985).

The proper standard for judging attorney performance is that of reasonably effective assistance, considering all the circumstances. When a convicted defendant complains of the effectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. 236 Kan. 650, Syl. ¶ 3.

With regard to the required showing of prejudice, the proper standard requires the defendant to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. 236 Kan. 650, Syl. ¶ 3.

3. Ineffective assistance of counsel during voir dire or in the use of peremptory challenges.

We note Ji's trial counsel, on appeal, is arguing he was ineffective during the trial by claiming he (1) failed to raise the issue of the jurors' religious prejudice and discuss with the potential jurors their religion and how this could affect their judgment in arriving at a verdict; (2) allowed jurors who were related to the victims or friends of the victims to remain on the jury; (3) failed to press the issue of jurors' statements that they disagreed with the defense of insanity; and (4) failed to note and strike prospective jurors from the panel who disagreed with the defense of insanity but stated they could give it proper consideration. Ji argues it was the cumulative effect of his trial counsel's errors that denied him a fair trial by an impartial jury.

We note Ji fails to identify one person who should have been excused from serving on the jury. He does not explain or support his conclusory statement that the overall likelihood of an unfair trial was increased by alleged trial counsel errors. It is not explained how the religious belief of any juror affected the ability of that juror to render a verdict according to the law. The claim that trial counsel's failure to press the issue of jurors' statements that they disagreed with the defense of insanity prejudiced him is not supported by any facts. In addition, Ji makes no citations to the record regarding these claims and fails to establish in what manner he was prejudiced by the various errors attributed to his attorney's performance during voir dire. This contention is without merit.

4. Failure to file motions to suppress illegally seized evidence and Ji's statements after his arrest.

Ji next contends his counsel was ineffective in failing to timely file motions to suppress illegally seized evidence and statements made by Ji after his arrest. First, Ji argues that evidence adduced at the trial may have been obtained by the police in violation of Ji's Fourth Amendment rights. Ji alleges that his defense counsel failed to determine whether the police had obtained a search warrant to search Ji's vehicle.

This contention is without merit. During the course of the trial, Detective Lyle Armitage testified that he conducted a search of Ji's automobile. Defense counsel objected to any mention of the items retrieved from the automobile until such time as the

basis for the search was shown. Defense counsel was then advised that there was a search warrant issued for Ji's car, and he withdrew his objection to the admission of evidence found in the car. Ji fails to explain or demonstrate how he was prejudiced by his attorney's failure to file a written motion to suppress evidence seized under the search warrant.

Second, Ji speculates that if counsel had filed a motion to suppress, the "cumulative, irrelevant, excessive, and greatly prejudicial" evidence seized by the police from his bag and person would not have been admitted into evidence. During the trial, Ji's counsel did object to the admission of that evidence. The State responds that the admission of the physical evidence collected in the church and from Ji's person was challenged in the trial court and found admissible and could not have been suppressed by the defendant under any theory.

After Ji entered the Calvary Baptist Church, he took a semiautomatic handgun from his duffel bag and fired 15 rounds of ammunition into the congregation. Twine, handcuffs, a meat cleaver, two fully loaded .44 magnum revolvers, and several boxes of ammunition were found in the duffel bag shortly after the shooting. A leather belt and pouch, and keys, including two handcuff keys, were taken from Ji when he was booked into the Lyon County Jail. Ji argues more than mere possession of the items is required for their admission into evidence. Ji asserts the prosecutor used these items to suggest to the jury that Ji had terrible things in store for the church members. Ji contends the trial court abused its discretion in admitting such evidence because its probative value outweighed its prejudice to the defendant.

The State responds that during the trial Ji made "intent to kill," an element of first-degree murder, an issue. The State contends these items in Ji's possession were relevant to establish his prior intent to commit the offenses.

K.S.A. 60-445 provides that, except as otherwise provided, the judge may as a matter of discretion exclude evidence if the judge finds that its probative value is substantially outweighed by the risk that its admission will unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered.

The admissibility of physical evidence lies within the sound discretion of the trial court and is to be determined on the basis of its relevance in connection with the accused and the crime charged. *State v. Nicholson*, 225 Kan. 418, 419, 590 P.2d 1069 (1979). Relevant evidence is evidence having any tendency in reason to prove any material fact. K.S.A. 60-401(b). The determination of relevancy is a matter of logic and experience, not a matter of law. Furthermore, when a physical object is offered into evidence and a question arises as to its connection with either the defendant or the crime charged, unless it is clearly irrelevant, the object should be admitted for such weight and effect as the jury sees fit to give it. *Nicholson*, 225 Kan. at 420.

Here, the evidence was relevant as to proving the material fact of defendant's premeditated "intent to kill." The trial court did not abuse its discretion in admitting the evidence. Under the circumstances, the attorney's failure to file a motion to suppress the statements and the physical evidence did not deprive him of a fair trial.

Third, Ji contends any statement he made during the interrogation by the detectives would have been suppressed if a motion to suppress had been timely filed. Ji argues the information obtained from him by the detectives could not be discovered from other sources and its improper admission into evidence was damaging. This contention is without merit.

Copies of the detectives' reports were delivered to Ji's counsel on March 21, 1988, and March 30, 1988. Defense counsel admitted the reports were provided to prior counsel for Ji, but he did not recall seeing these reports. The trial judge found the defendant's statements had not been withheld from Ji's counsel. After the judge concluded that during trial was not an appropriate time to file his motion to suppress, defense counsel advised the judge that he did not believe the issue was important, and the matter was dropped.

We have reviewed the record and have determined that the only evidence obtained by the detectives from Ji was his place of employment and residence during the two years immediately preceding the shootings and that the evidence was admissible. Ji has not shown he was prejudiced by his attorney's failure to file a motion to suppress the statements or the physical evidence

prior to trial or that the admission of the evidence deprived him of a fair trial.

5. Counsel's failure to have Ji's experts evaluate Ji using the proper legal standard for insanity.

Ji next contends his counsel was ineffective in preparing Ji's experts to evaluate him by the proper legal standard for insanity because: (1) Defense counsel should have been aware that the reports of the staff at Larned State Security Hospital did not specifically determine if the defendant understood that what he was doing (firing his gun in the church) was against the law; and (2) if defense counsel had been aware the Larned State Security Hospital staff reports had used the incorrect legal standard for insanity, thus jeopardizing the insanity defense, counsel would have more strenuously opposed the court finding that Ji was competent to stand trial. Ji's argument concludes, without explanation, that prejudice to Ji can be presumed and the impairment of the defendant's Sixth Amendment right is easy to identify.

A defendant is not criminally responsible for his acts if, because of mental illness or defect, he lacked the capacity either (a) to understand the nature of his acts, or (b) to understand that what he was doing was prohibited by law. PIK Crim. 2d 54.10. Ji's appeal issue focuses on (b). Both defense experts testified Ji understood the nature of his acts. One expert, Dr. Anthony Troiano, testified he could not form an opinion as to whether Ji knew that what he was doing was against the laws of the State of Kansas but that Ji did expect to receive the death penalty and that implies Ji knew there was a punishment for his wrongful act. The other defense expert, Thomas Runge, initially testified Ji knew that what he was doing was against the law, then later said he did not know if he could give an opinion in that regard. We note that the expert had stated earlier in his testimony that Ji understood when he shot the gun it was against the law and that shooting people was against the law.

Ji has failed to show that there is a reasonable probability that, but for counsel's alleged unprofessional errors, the experts would have changed their testimony and the result of the proceeding would have been different.

Ji next alleges the trial judge failed to consider his claim of ineffective assistance of counsel.

Ji did claim ineffective assistance of counsel in his Motion for New Trial, Additional Grounds Supporting Motion for New Trial, and Further Grounds Supporting Motion for New Trial, alleging his defense counsel was ineffective because counsel failed, refused and/or was unable to adequately investigate the background and personal history of the defendant for the existence of evidence that would aid in defendant's defense and/or to present such evidence at defendant's trial. Prior to his appeal, Ji never asserted his trial attorney was ineffective by failing to have Ji's experts evaluate Ji using the proper legal standard for insanity in Kansas.

The defendant cannot raise points on appeal which were not presented to the trial court. *State v. Holley*, 238 Kan. 501, 508, 712 P.2d 1214 (1986). This issue is without merit.

6. Failure to grant Ji a continuance of the trial deprived him of a fair trial.

During a telephone conference call the day before trial, Ji's counsel orally requested a continuance. Ji argues the court was aware his counsel was not prepared for trial. Ji claims prejudice caused by the failure to grant the continuance was clearly demonstrated by his counsel's lack of preparation during voir dire and his counsel was so harried that he made crucial mistakes.

Cortland Berry was appointed to represent Ji on November 16, 1989, 61 days before trial. Ji's jury trial was originally scheduled to commence on December 4, 1989. On November 20, 1989, the court granted Ji's (Berry's) motion for a continuance and continued the trial until January 17, 1990. On January 8, 1990, the court heard and denied Ji's motion to dismiss the case because he had been denied his right to a speedy trial. The trial judge indicated on January 8, 1990, that he would be available on January 11, 1990, to take up any motions which might arise prior to trial. The parties appeared on January 11, 1990, and argued several motions. On Friday, January 12, 1990, the court conducted a telephone conference call with counsel to discuss procedural matters pertaining to the jury trial. It is important to observe defense counsel did not request a continuance of the

trial on any of these dates but waited until January 16, 1990, the day prior to the commencement of the trial, to make the request.

The granting of a continuance lies within the sound discretion of the trial court and its refusal to grant a continuance will not be overturned in the absence of a clear abuse of discretion. Discretion is abused only where no reasonable person would take the view adopted by the court; if reasonable persons could differ as to the propriety of the action taken by the trial court, it cannot be said the trial court abused its discretion. Absent a showing of actual prejudice to the defendant, a trial court's refusal to grant a continuance does not constitute an abuse of discretion. *State v. Haislip*, 237 Kan. 461, 471-72, 701 P.2d 909, *cert. denied* 474 U.S. 1022 (1985).

Ji does not identify the "crucial mistakes" he claims his counsel made and fails to demonstrate any actual prejudice that occurred as a result of the court's failure to grant a continuance. Under the circumstances, the trial court did not abuse its discretion in refusing to grant a continuance.

7. Failure to grant trial counsel's request for an additional determination of Ji's competency to assist in his defense.

A person is incompetent to stand trial when he is charged with a crime and, because of mental illness or defect is unable: (a) to understand the nature and purpose of the proceedings against him; or (b) to make or assist in making his defense. K.S.A. 22-3301. Ji argues although it had previously been determined there was a substantial probability that he would not be competent in the near future, his former attorney, Kym Myers, based on his observation of Ji, decided that Ji was competent to stand trial and aid in his defense. Kym Myers subsequently fought with the defendant and was dismissed.

On January 22, 1990, the fourth day of the trial, defense counsel filed a motion requesting Ji's competency to stand trial be re-determined. Defendant's trial counsel claimed that because of Ji's delusional state of mind, Ji was going to testify without discussing his testimony with his counsel. In addition, Ji did not feel it necessary to call witnesses or discuss with his counsel what evidence or witnesses his counsel would present to the jury. Defense counsel stated Ji had concluded he would not receive a fair

trial in Emporia because it was full of "lying white supremacists." Ji believed that the church people were evil; therefore, he had not committed a crime. Ji was convinced that his previous court-appointed attorneys were involved in a conspiracy with the pros-ecutor. Defense counsel argued to the judge the unresponsiveness of his client prevented an adequate defense and required the trial court to order Ji's competency again be determined.

The trial judge did not perceive the allegations contained in the motion as indicating that Ji was incompetent to stand trial. The trial judge noted the defendant may desire to do something counsel disagreed with or that was not in defendant's best in-terest, but that was defendant's right. The judge stated he had observed the demeanor of the defendant during the course of the trial and determined from his observations Ji was competent to stand trial.

On appeal, Ji contends the trial judge overlooked the fact that based on the same mental condition that he was exhibiting during the trial, Ji had previously been found incompetent to stand trial. Ji argues the trial judge ignored the medical reports and deter-mined that Ji was competent to stand trial solely on his obser-vation of Ji through the first four days of the trial.

K.S.A. 22-3302(1) provides:

"At any time after the defendant has been charged with a crime and before pronouncement of sentence, the defendant, the defendant's counsel or the prosecuting attorney may request a determination of the defendant's competency to stand trial. If, upon the request of either party or upon the judge's own knowledge and observation, the judge before whom the case is pending finds that there is reason to believe that the defendant is in-competent to stand trial the proceedings shall be suspended and a hearing conducted to determine the competency of the defendant."

In *State v. Green*, 245 Kan. 398, 781 P.2d 678 (1989), during the course of the trial, Green threw a chair at a court guard, called the judge and the attorneys "peckerwoods" and thereafter refused to communicate with his own attorney. Green's attorney moved for a suspension of the trial to obtain a mental evaluation of his client. The trial judge observed that Green had been alert during the trial and had consulted with his attorney. The trial judge denied the motion, stating that Green only lacked faith in the proceeding, not understanding. On appeal, Green contended

the trial court abused its discretion in failing to recess the trial to obtain a psychological or psychiatric evaluation to determine whether or not he was competent to stand trial. The Supreme Court stated K.S.A. 22-3301(1) and K.S.A. 22-3302(2) and (3) indicate the district judge is not required to seek the aid of a psychological or psychiatric evaluation of the defendant; the option is merely permissive. Whether a hearing on competency is needed during trial is a matter which is left to the sound discretion of the trial court, which will not be disturbed on appeal absent an abuse of discretion. The district judge had specifically noted Green had consulted with his attorney during the course of the proceedings and that the district judge had an opportunity to observe the defendant's behavior firsthand. The court determined the record reflected the district court had reasonable grounds to believe Green was competent. 245 Kan. at 412-13.

Here, as in *Green*, the trial judge also had an opportunity to observe the defendant throughout the course of the first three days of trial. The record indicates that the defendant and his attorney were able to discuss trial strategy. While there may have been disagreement with regard to what evidence to present, Ji did permit his attorney to introduce the testimony of two psychologists (Runge and John Randolph) and a psychiatrist (Troiano) in support of his insanity defense. Based on the record, the trial judge did not abuse his discretion in denying Ji's motion for a determination of Ji's competency to stand trial or refusing to hold an additional evidentiary hearing.

8. Refusal to grant Ji's motion for judgment of acquittal.

After the State rested its case, Ji moved for a judgment of acquittal, arguing that the State had failed to prove Ji's motivation for committing the crime and to present sufficient evidence for the jury to find beyond a reasonable doubt that Ji had deliberately killed Tom DeWeese. Ji argues there is only circumstantial evidence that he intended to kill anyone in the church. Ji contends if his intent was to kill people, more people would have been killed. Ji claims the only evidence on his intent to kill was his angry assertion when apprehended that he "killed people."

A trial judge in passing upon a motion for judgment of acquittal, K.S.A. 22-3419, must determine whether upon the evidence,

giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If the judge concludes guilt beyond a reasonable doubt is a fairly possible result, the judge must deny the motion and let the jury decide the matter. If the judge concludes that upon the evidence there must be such a doubt in a reasonable mind, the judge must grant the motion. *State v. Colbert*, 221 Kan. 203, 209-10, 557 P.2d 1235 (1976).

The evidence is that Tom DeWeese was sitting in the back pew on the east side of the church with his family. Ji was close to where Tom DeWeese was sitting when he shot DeWeese in the back two times. After Ji was wrestled to the ground he stated, "I killed fifteen and I am going to kill all of you." When a church member asked Ji if he shot the gun in the air or at people, Ji said, "I killed people."

Under the facts, the trial judge found there was sufficient evidence of Ji's intent to kill and that a reasonable mind might fairly conclude beyond a reasonable doubt that Ji was guilty of murder in the first degree. The trial court did not err in denying Ji's motion for judgment of acquittal.

9. Refusal to prohibit the psychiatric testimony of Dr. Lacoursiere.

On May 6, 1988, Ji filed a notice of his intent to rely on the defense of insanity. On November 16, 1988, the court ordered Ji to submit to a mental examination by an expert for the State for the purpose of determining his sanity at the time the offense was committed. Ji was examined on November 21, 1988, at the Lyon County Jail by Dr. Roy B. Lacoursiere, a psychiatrist. Prior to the examination, Ji was not given *Miranda* warnings.

During the fourth day of the trial, defense counsel filed a motion to prohibit the psychiatric testimony of Dr. Lacoursiere. Ji asserts that since he was not given his *Miranda* warnings prior to the psychiatric examination or specifically informed that the examination was to inquire into his sanity rather than his competency, the testimony of Dr. Lacoursiere should be excluded from evidence.

K.S.A. 22-3219(2) states in part:

"A defendant who files a notice of intention to rely on the defense of insanity thereby submits and consents to abide by such further orders as the court may make requiring the mental examination of the defendant and designating the place of examination and the physician or physicians by whom such examination shall be made."

Ji argues that although Kansas law requires a defendant to submit to an examination to determine his sanity, this does not indicate he waived his constitutional right not to be a witness against himself. Ji claims the principles of *Estelle v. Smith*, 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866 (1981), which dealt only with the penalty phase in a capital murder case, also apply to the guilt-innocence phase of a trial. In addition, he argues because he was not specifically informed he was being examined to determine his sanity, he is protected by K.S.A. 22-3302(3), which prohibits statements made by a defendant in the course of a competency examination from being admitted into evidence in any criminal proceeding.

In *Estelle v. Smith*, Smith was indicted for murder, and the State announced its intention to seek the death penalty. The trial court ordered the defendant to undergo a psychiatric examination to determine his competency to stand trial. After the psychiatrist concluded that he was competent, the defendant was tried by a jury and convicted. State law then required a separate penalty proceeding at which the jury had to assess the defendant's future dangerousness, one of three questions on which the State had the burden of proof beyond a reasonable doubt before the death sentence could be imposed. At the defendant's sentencing hearing, the State called as a witness the psychiatrist who had conducted the pretrial psychiatric examination. Following denial of a defense motion to exclude the testimony, the psychiatrist testified that, among other things, the defendant was "'going to go ahead and commit other similar or same criminal acts if given the opportunity to do so.' " 451 U.S. at 460. Based on the psychiatrist's testimony, the death penalty was imposed.

On *certiorari*, the United States Supreme Court held that the admission of the psychiatrist's testimony violated the defendant's Fifth Amendment privilege against compelled self-incrimination since the defendant was not advised before the pretrial examination that he had a right to remain silent and that any statement

he made could be used against him at the sentencing proceeding. The defendant's statements to the psychiatrist, when faced while in custody with a court-ordered psychiatric examination, not being given freely and voluntarily without any compelling influence, could be used at the penalty phase only if the defendant had been apprised of his rights and had knowingly decided to waive them. 451 U.S. at 469. The Court also held the admission of the psychiatrist's testimony violated the defendant's Sixth Amendment right to the assistance of counsel since defense counsel were not notified in advance that the psychiatric examination would encompass the issue of their client's future dangerousness. Under such circumstances, the defendant was denied the assistance of his attorney in making the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed. The Sixth Amendment right attached when the psychiatrist examined the defendant in jail, and that interview proved to be a "critical stage" of the aggregate proceedings against the defendant. 451 U.S. at 471.

In *Smith* the Court, however, did observe:

"Nor was the interview analogous to a sanity examination occasioned by a defendant's plea of not guilty by reason of insanity at the time of his offense. When a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case. Accordingly, several Courts of Appeals have held that, under such circumstances, a defendant can be required to submit to a sanity examination conducted by the prosecution's psychiatrist." 451 U.S. at 465.

Ji acknowledges *Smith* is factually different from this case. Ji fails to cite any portion of the record where it is shown that the State also wanted to use the sanity examination to reevaluate Ji's competency. It is apparent from a plain reading of 22-3302(3) that a defendant who files a notice of his intention to rely upon the defense of insanity submits and consents to abide by such orders as the court may make requiring a mental examination of the defendant. Thus, Ji, by filing his notice of intent to rely upon the defense of insanity, consented to the examination by Lacoursiere. *Smith* does not apply.

10. Refusal to give defense counsel's requested instruction on premeditation.

In determining whether there was error in failing to give an instruction, jury instructions are to be considered together and read as a whole, without isolating any one instruction. Error cannot be predicated on the refusal to give specific instructions where those which were given cover and include the substance of those refused and are a correct statement of the law. *State v. Crabtree*, 248 Kan. 33, Syl. ¶¶ 5, 6, 805 P.2d 1 (1991).

The trial court gave the following instruction based on PIK Crim. 2d 56.04:

" 'Deliberately and with premeditation' means to have thought over the matter beforehand."

In *State v. Bierman*, 248 Kan. 80, 90, 805 P.2d 25 (1991), we discussed the element of premeditation, stating that premeditation may be inferred from the established circumstances of the case provided the inference is reasonable. From this statement in *Bierman*, Ji concludes that a special instruction defining premeditation was necessary for the jury to understand what premeditation meant in the context of a murder. He argues the jury should decide which was the more reasonable of the inferences for Ji's entering the church: (1) to kill people or (2) to show a display of power. Ji argues that if he entered the church to display his power by firing his weapon in the church, he was guilty of unlawfully killing a human being, without malice, unintentionally in a wanton commission of an unlawful act not amounting to a felony, *i.e.*, involuntary manslaughter. Ji alleges the jury's determination he was guilty of murder in the first degree or another degree of the crime hinged on the court's instruction defining "premeditation." Ji's counsel argued at trial that the PIK instruction was inadequate and requested this instruction:

" 'Premeditation' means that there was a design or intent before the act; that is, that the accused planned, contrived, and schemed beforehand to kill a certain individual."

Defendant did not contemporaneously object to the court's instruction when it was read to the jury. His objection during the instructions conference was that premeditation and deliberateness were two different things.

If there is no contemporaneous objection to a jury instruction, an appellate court may reverse only if the instruction given was

clearly erroneous. An instruction is clearly erroneous when a reviewing court reaches a firm conviction that, if the trial error had not occurred, there is a real possibility that the jury would have returned a different verdict. *State v. Patterson*, 243 Kan. 262, Syl. ¶ 4, 755 P.2d 551 (1988).

Ji offers no further argument or explanation regarding this claim. Here, with or without an objection, the proper instruction on premeditation was given by the trial court.

11. The court's modification of PIK Crim. 2d 54.10 required the jury to disregard the testimony of defendant's experts.

During the trial, Runge, the psychologist from Larned State Security Hospital, testified the *M'Naghten* Rule has two parts: "You have to know the nature and quality of your acts, but you also have to be able to distinguish between right and wrong."

Runge concluded Ji was criminally insane because Ji was unable to distinguish between right and wrong. Dr. Troiano, the psychiatrist from Larned State Security Hospital, testified he was asked to do a *M'Naghten* evaluation on Ji. Troiano testified the *M'Naghten* evaluation consists of three parts: (1) whether the person understands the nature and consequences of his actions; (2) whether the person knew right from wrong; and (3) whether the person's act is the result of his delusional process where he has no control over acting upon that delusion.

Following the *M'Naghten* Rule, the trial court instructed the jury that the defendant is not criminally responsible for his acts if because of mental illness or defect, he lacked the capacity either (a) to understand the nature of his acts, or (b) to understand that what he was doing was prohibited by law, based on PIK Crim. 2d 54.10. Because the defendant's experts had expressed a contrary definition of criminal responsibility, the trial court added the following language:

"Certain testimony has been given by medical experts expressing a different view of the law than that contained in this instruction. You are to follow the law as contained in this instruction."

Ji claims that, because of the modified instruction, the jury gave no credence to the testimony of defendant's experts. Ji concludes the additional language was unnecessary, erroneous, and a grave injustice and, therefore, requires reversal. As au-

thority, Ji quotes *State v. DeVries*, 13 Kan. App. 2d 609, 618-19, 780 P.2d 1118 (1989), which states:

"The opportunity to mislead the jury or cause it to become unduly influenced by specific wording in an instruction which it has been told is 'the law that applies to this case' compels us to reach the conclusion that using the additional language objected to by DeVries was erroneous and requires reversal."

The portion of the jury instruction objected to in *DeVries*, a modification of PIK Crim. 2d 52.09, dealt with credibility of witnesses. The Court of Appeals held that language in an instruction concerning the credibility of witnesses which focuses on the credibility of certain witnesses or certain testimony is erroneous. That determination, however, is not analogous to this situation.

An expert witness may express an opinion or inference if the judge finds that testimony is based on facts or data perceived by or personally known or made known to the witness and is within the scope of the special knowledge, skill, experience, or training possessed by the witness. K.S.A. 60-456.

Here, the added language does not discuss credibility of the expert witnesses, it merely states that the jurors are to follow the law of insanity as instructed by the judge. The additional language in the instruction was necessitated by defense experts' misstatement of the law, *i.e.*, the *M'Naghten* rule, during their testimony and their conclusion in the evaluation report that "on or about March 6, 1988, Mr. Ji was experiencing symptoms of a major mental illness ('disease of the mind') which would qualify him as having been legally insane according to M'Naghten criteria."

A psychiatrist's or psychologist's opinion of the legal definition of the *M'Naghten* rule is not within the scope of his or her special knowledge, skill, experience, or training and, in this instance, was a misstatement of the law. Under the circumstances, the trial court properly instructed the jury to follow the law as instructed.

12. *Ji's statutory right to a speedy trial.*

On January 8, 1990, defense counsel filed a motion to dismiss the information for failure to provide the defendant with a speedy trial. After a hearing the same day, the court denied the motion.

Ji contends that the trial court determined that the statutory time limit of K.S.A. 22-3402(1) had not run because the defendant had been adjudged incompetent to stand trial. Ji claims he did not want or request his competency to be determined. Ji asserts that to obtain a speedy trial he fought his attorneys, the court, and the experts regarding his competency for a year and one-half. Ji argues he never authorized his attorney to request a competency hearing; therefore, he should not be charged with the period he was alleged to be incompetent.

K.S.A. 22-3402 governs the period of time for a speedy trial. As relevant, K.S.A. 22-3402 provides:

"(1) If any person charged with a crime and held in jail solely by reason thereof shall not be brought to trial within ninety (90) days after such person's arraignment on the charge, such person shall be entitled to be discharged from further liability to be tried for the crime charged, unless the delay shall happen as a result of the application or fault of the defendant, or a continuance shall be ordered by the court under subsection (3).

. . . .

"(3) The time for trial may be extended beyond the limitations of subsections (1) and (2) of this section for any of the following reasons:

(a) The defendant is incompetent to stand trial;

(b) A proceeding to determine the defendant's competency to stand trial is pending and a determination thereof may not be completed within the time limitations fixed for trial by this section."

The time between the arraignment on April 8, 1988, and the commencement of trial on January 17, 1990, which was expressly allocated to the defense by the district judge included the periods (1) from May 2, 1988, to November 8, 1989, and (2) from December 4, 1989, until January 17, 1990.

The period from May 2, 1988, to November 8, 1989, was assessed to the defendant because on May 2, 1988, the defendant's attorney filed a motion to determine the defendant's competency. The court conducted a hearing on the motion on August 25, 1988, and found the defendant incompetent to stand trial at that time. Defendant's status as incompetent to stand trial continued until November 8, 1989.

The period from December 4, 1989 until the trial commenced on January 17, 1990, was assessed to the defendant for the reason that the defendant requested and obtained this period of time for a continuance of the trial.

The time between filing a competency hearing motion and the district court's decision on that motion is chargeable to the defendant where the judicial decision is made within a reasonable time period. *State v. Prewett*, 246 Kan. 39, Syl. ¶ 3, 785 P.2d 956 (1990). Under the circumstances of this case, the period from May 2, 1988, to August 25, 1988, was a reasonable period of time for the trial court's decision on the motion. Accordingly, the time from May 2, 1988, until August 25, 1988, when the trial court found the defendant incompetent to stand trial is chargeable to the defendant by virtue of the pending motion to determine competency. The period from August 25, 1988, until November 8, 1989, when defendant was found competent is also charged to the defendant. K.S.A. 22-3402(3).

The filing of notice of intent to rely on the insanity defense, pursuant to K.S.A. 22-3219, also operates as a waiver by the defendant of the requirements of the speedy trial statute (K.S.A. 22-3402) insofar as any such trial delay was reasonably occasioned by and attributable to the assertion of the insanity defense. *State v. Maas*, 242 Kan. 44, Syl. ¶ 1, 744 P.2d 1222 (1987).

On May 6, 1988, the defendant filed a notice of intent to rely upon the defense of insanity. Prior to that time, on March 24, 1988, the court had appointed E. Ross Taylor as a medical expert for the defendant. Taylor prepared a report on defendant's sanity but did not forward his report to W. Irving Shaw, the defendant's attorney, until August 24, 1988. Dr. Taylor's report was not filed with the court until January 8, 1990. The time between May 6, 1988, and January 8, 1990, is chargeable to the defendant because of the assertion of the insanity defense. This includes the 26-day period from November 8, 1989, to December 4, 1989.

The balance of the time between April 8, 1988, and January 17, 1990, amounts to 24 days which, if chargeable to the State, is well within the speedy trial limits.

Ji was not denied his statutory right to a speedy trial.

13. The appointment of additional counsel.

On November 16, 1989, Cortland Berry was appointed defense counsel. Berry believed he could not fully and fairly represent Ji because of the time allotted to prepare for trial in a case of this nature. On November 29, 1989, Berry filed a motion for

appointment of an additional counsel at the county's expense to assist in Ji's defense.

On December 6, 1989, at the hearing on the motion for additional counsel, Ji's attorney argued additional counsel was required because there were approximately 100 witnesses endorsed for the State. In addition, there had been numerous hearings and proceedings which had generated hundreds of pages of witness statements, police reports, and medical, scientific, and expert evidence. Ji's attorney argued Ji's former appointed counsel had neither analyzed nor organized the information so that it was useful to him; the issue of defendant's competency remained open; there were numerous pretrial motions to consider and file; evidence on defendant's behalf needed to be developed; because of defendant's delusional beliefs, there was the possibility that trial counsel's conduct of the trial would conflict with the defendant's desires; and the defendant's determination to control the trial required that an additional counsel be appointed to take positions contrary to Ji's trial counsel.

The trial court noted the rules of the State Board of Indigents' Defense Services allow only one attorney to be compensated for the same proceedings. Where multiple attorneys are appointed to represent a defendant, the appointing court designates the attorney to be compensated. The trial court stated if an attorney was willing to serve as co-counsel with Berry, subject to the rules of the Board, it would appoint that attorney and would allow the attorney to participate in the trial as co-counsel or assistant counsel for Berry.

As to the defense attorney's request for an additional counsel to take positions contrary to those of trial counsel, the trial court observed there was no procedure to appoint a guardian ad litem or independent counsel for a defendant in a criminal case. The additional appointed attorney would not be subject to direction from the defendant or the defendant's trial counsel. The court determined the appointment of additional counsel under such circumstances would violate the defendant's constitutional rights. Under the circumstances, the trial court's refusal to appoint an additional attorney was correct.

14. Refusal to control prejudicial pretrial publicity.

On appeal, Ji states there had been massive pretrial publicity, some prejudicial to him. He argues that with trial less than two months away, the public's interest in the case was increasing and he perceived a clear and present danger that the two years of prejudicial pretrial publicity made a fair trial in the local community impossible.

On November 20, 1989, defense counsel filed a motion to control prejudicial publicity. The motion sought to (1) exclude the public and print and electronic media from all pretrial hearings in this case; (2) prohibit all attorneys, parties, witnesses, law enforcement personnel, and court personnel who were connected to the prosecution or investigation of the case from extrajudicially releasing information in any form to any agent or employee of any news media concerning any aspect of the case; (3) direct that all records and transcripts in the case, if not already under seal, be sealed until a jury was impaneled and sequestered or until after trial; and (4) prohibit the use of cameras to photograph the court proceedings. On December 6, 1989, the court concluded there was no showing the pretrial publicity was prejudicial and denied the motion.

"A trial court may close a preliminary hearing, bail hearing, or any other pretrial hearing, including a motion to suppress, and may seal the record only if: (1) The dissemination of information from the pretrial proceeding and its record would create a clear and present danger to the fairness of the trial, and (2) the prejudicial effect of such information on trial fairness cannot be avoided by any reasonable alternative means." *Kansas City Star Co. v. Fossey*, 230 Kan. 240, Syl. ¶ 2, 630 P.2d 1176 (1981).

Obviously, there was an enormous amount of publicity concerning the shootings in the Emporia area. Unfortunately, there was no place in this state that the facts of the shootings and the arrest of the defendant were not publicized. Modern communication and network methods for distribution of news allow the news media to distribute information by newspaper, radio, and television to the public statewide. News of the incident and the investigation was not, nor could it be, limited to the Emporia area. Because of the facts of the crime, the news was immediately spread throughout Kansas.

Media publicity alone has never established prejudice per se. *State v. Ruebke*, 240 Kan. 493, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987).

"[I]ndicative of whether the atmosphere is such that a defendant's right to a fair and impartial trial would be jeopardized, courts have [looked at such] factors [as] the particular degree to which the publicity circulated throughout the community; the degree to which the publicity or that of a like nature circulated in other areas to which venue could be changed; the length of time which has elapsed from the dissemination of the publicity to the date of trial; the care exercised and the ease encountered in the selection of the jury; the familiarity with the publicity complained of and its resultant effect, if any, upon the prospective jurors or the trial jurors; the challenges exercised by the defendant in the selection of a jury, both those peremptory and those for cause; the connection of government officials with the release of the publicity; the severity of the offense charged; and the particular size of the area from which the venire is drawn." Annot., 33 A.L.R.3d 17, § 2(a).

The jury was selected in one day. The trial court had no difficulty in finding a panel of jurors who stated that they could render a fair and impartial verdict. Unless we are to assume that (1) the jurors selected to try the defendant violated their oath when they swore that they could give the defendant a fair trial or (2) an individual can commit a crime so heinous that news coverage generated by that act will not allow the perpetrator to be brought to trial, the defendant has not established substantial prejudice. Ji has failed to show that the pretrial publicity prejudiced his right to a fair trial.

15. Refusal to prohibit electronic and photographic coverage of the trial.

On January 10, 1990, seven days before the trial commenced, Ji moved to prohibit electronic and photographic coverage of the trial. At the hearing on the motion, defense counsel contended that because of his client's delusional beliefs, media coverage could excite the defendant and adversely affect his right to a fair trial. Further, he argued there was a real danger that Ji would use the trial as a forum to argue his deluded beliefs and by his own actions be deprived of a fair trial.

On appeal, the defendant asserts television and photographic coverage has the unique ability to transmit exceptionally prejudicial images and claims that some individuals, who had observed prior news coverage, stated that the defendant looked and acted too intelligent to be insane. Counsel argues he is unaware of any other murder case that generated such intense public hostility, and that he was criticized by the press for defending Ji. Defense

counsel claimed both before trial and on appeal that electronic and photographic coverage of the trial would prevent Ji from having a fair trial. On appeal, defendant argues such coverage imposed unwarranted pressure on jurors who resided in the community where the crime occurred and the alleged victims and their families lived.

The trial court noted the defendant had a right to a public trial and had more to fear from a secret trial. The judge asserted that to restrict dissemination of information relative to this trial would be a disservice to the defendant. The court stated that the publicity resulting from the media coverage of the trial would be controlled by proper admonitions to the media and the jury. The judge also indicated the court's media coordinator would report to the court any potential problems with the media's coverage of the trial.

The propriety of granting or denying permission to the news media to broadcast, record, or photograph court proceedings involves weighing the constitutional guaranties of freedom of the press and the defendant's right to a public trial on the one hand and, on the other hand, the due process rights of the defendant and the power of the courts to control their proceedings in order to permit the fair and impartial administration of justice. *State v. McNaught*, 238 Kan. 567, Syl. ¶ 2, 713 P.2d 457 (1986).

The due process rights of an accused are not inherently denied by television trial coverage, and no per se constitutional rule prohibits permitting broadcast or photographic coverage of criminal proceedings. Where a trial court permits photographic, audio, and television reproduction of the trial proceedings, the defendant has the burden to prove prejudice by showing that media coverage prevented the defendant from presenting his defense or in some way affected the ability of the jury to judge defendant fairly. *State v. McNaught*, 238 Kan. 567, Syl. ¶¶ 3, 5.

Prior to the commencement of the trial, the court admonished the jury to not listen to or read any news accounts of the trial proceeding. The court advised the jury there would be cameras in the courtroom and reporters present. The court explained the substance of Supreme Court Rule 1001 (1991 Kan. Ct. R. Annot. 401) to the jurors and advised them the news media would not be permitted to photograph individual jurors and that, although

a picture of the jury might appear in the background, no individual jurors could be identified in a photograph. The court further admonished the jurors that if any broadcast about the trial should be on the television that they were to leave the room or turn the television off.

Ji does not point to any event involving electronic or photographic coverage during the trial that prejudiced his right to a fair trial. Ji failed to meet his burden of proving the media coverage of the trial prevented him from presenting his defense or affected the ability of the jury to judge him fairly.

16. Refusal to strike previous defense counsel's stipulation that Ji was competent to stand trial.

On June 28, 1989, the State filed a motion to determine Ji's competency and to appoint two qualified and licensed physicians to examine the defendant. On July 21, 1989, the court granted the motions and appointed Dr. Harold M. Voth as requested by the State and Dr. Bill Logan as requested by the defendant.

On September 19, 1989, the court permitted Jeff Larson (Ji's third appointed attorney) to withdraw as defense counsel and appointed Kym Myers to represent defendant. At the November 8, 1989, competency hearing, Dr. Voth's report that the defendant was competent to stand trial was accepted by the judge. Dr. Logan, who had met with the defendant, had not yet submitted his report. Ji's defense counsel, Kym Myers, advised the court that his client would stipulate that he was competent to stand trial. Based on the stipulation and the report of Dr. Voth, the court determined Ji was competent to stand trial.

On January 10, 1990, approximately one week prior to the defendant's trial, defense counsel Berry moved to strike former counsel's stipulation that defendant was competent to stand trial, claiming the defendant was incapable of assisting counsel in his defense. At the hearing on January 11, 1990, the State pointed out to the court the only additional evidence was Dr. Logan's report which stated Ji was not competent to stand trial. The State argued that Dr. Logan's report should be given little credence because it was based on a 10-minute interview in which the defendant stated only his name, date of birth, and the fact that he was from Taiwan. Dr. Logan's report indicated Ji was argu-

mentative and that Ji stated he was not required by the Fifth or Sixth Amendment to answer questions.

Ji claims that Dr. Voth's report was incomplete. Ji notes Dr. Voth was unconcerned about the presence of delusions or psychosis and their effect upon defendant during trial, while Dr. Logan took the opposite view and considered the effect defendant's delusions would have on the trial. Dr. Logan stated the trial would directly impinge on defendant's delusional beliefs and the defendant's delusional perceptions.

The court observed that the defendant filed this motion approximately 50-60 days after receiving Dr. Logan's report. The court also noted the report from Dr. Voth indicating Ji was competent to stand trial. The court stated that neither prior to the November 8 competency hearing nor subsequent to that hearing had he observed or had knowledge to indicate that the defendant was not competent to stand trial. The court stated that even without considering the defense counsel's stipulation, there was no substantial evidence that the defendant was incompetent to stand trial and found that Ji was competent to stand trial.

On appeal, defense counsel argues that although Ji was not legally incompetent under the Kansas statute, his mental functioning was daily incorporating current events into his delusional beliefs. As a result, he was unable to assist counsel in his defense and he became a witness against himself as well as becoming his attorney's adversary. Ji states the United States Supreme Court has set out the following factors to assist a court in determining a defendant's competence: (1) evidence of a defendant's irrational behavior; (2) defendant's demeanor before or during trial; (3) prior medical records or opinions by experts on defendant's competence; and (4) the observations or representations of the court and counsel, citing *Drope v. Missouri*, 420 U.S. 162, 180-82, 43 L. Ed. 2d 103, 95 S. Ct. 896 (1975). Ji argues his demeanor in court should not have been utilized by the trial judge in determining his competence. Ji states there was sufficient evidence of his irrational behavior in prior medical reports to indicate he was incompetent to stand trial.

"While the rule is generally recognized that trial courts are ordinarily bound by the stipulations of the litigants [citation omitted], it is likewise agreed that courts are warranted in relieving parties from stipulations which

have been improvidently or mistakenly made. [Citation omitted.] Circumstances justifying such relief are summarized in 73 Am. Jur. 2d, Stipulations § 13, pp. 548-49: '. . . [A] trial court may, in the exercise of judicial discretion, upon proper cause shown, relieve a party from a stipulation entered into in the course of a judicial proceeding when it appears that such relief is necessary to prevent manifest injustice to the parties seeking it, and that the granting of such relief will not place the adverse party at any disadvantage by reason of having acted in reliance upon the stipulation. It has thus been held that a stipulation should only be set aside after placing the parties in approximately the same positions in which they were or in positions of substantially equal advantage. And on appeal, the determination of the trial court as to the propriety of granting such relief will not ordinarily be interfered with, except where a manifest abuse of discretion is disclosed.' " *State v. Craven*, 215 Kan. 546, 548, 527 P.2d 1003 (1974).

The trial judge determined that even without the attorney's stipulation there was sufficient evidence that Ji was competent to stand trial. We agree with the trial judge. There is no showing that there has been manifest injustice to the defendant or that the trial judge abused his discretion by refusing to strike the stipulation that Ji was competent to stand trial.

17. Ji's request for change of venue.

Ji filed a motion for change of venue on November 30, 1989. The motion was partially heard on December 6, 1989, then continued to January 2, 1990, to allow the defendant's counsel an opportunity to obtain additional evidence in support of the motion. At the conclusion of the hearing on January 2, 1990, the court denied the motion to change venue, finding that the prejudice against Ji was not so great that he could not obtain a fair and impartial trial in Lyon County.

"A change of venue in a criminal case lies within the sound discretion of the trial court. The burden of proof is cast upon defendant to show prejudice in the community which will prevent him from obtaining a fair and impartial trial. Media publicity alone has never established prejudice per se. The defendant must show prejudice has reached the community to the degree it is impossible to obtain an impartial jury." *State v. Richard*, 235 Kan. 355, Syl. ¶ 5, 681 P.2d 612 (1984).

In *State v. Bierman*, 248 Kan. 80, 87, 805 P.2d 25 (1991), this court stated: To obtain a change of venue: (1) the burden to establish prejudice is on defendant, (2) not only prejudice must be shown but the prejudice must be such as to make it reasonably certain the defendant cannot receive a fair trial, (3) speculation

as to possible prejudice is not sufficient, (4) the State is not required to produce evidence to refute affidavits obtained by defendant, (5) the granting of a change of venue lies within the sound discretion of the trial court, and (6) the trial court's ruling thereon will not be disturbed absent a showing of prejudice to the substantial rights of the defendant. *State v. Sanders*, 223 Kan. 273, 280, 574 P.2d 559 (1977).

Ji states that although the record of the jury voir dire is insufficient to show prejudice, it does indicate how extensive the news coverage of the case was and the number of prospective jurors that had knowledge of the case and the people involved. Ji claims the voir dire of the jurors reveals there was sufficient evidence of a prejudicial nature of the news coverage and its effect on the whole community to show prejudice. Further, Ji claims in presenting the massive news reports and emotional letters and editorials concerning him, his attorney, and the case, as well as the results of a telephone survey, he has presented a classic example of how pretrial publicity and community atmosphere can prevent a defendant from having a fair trial in the county where the crime occurred. Ji argues it is impossible for a criminal defendant to show specific facts and circumstances which indicate that a defendant cannot obtain an impartial jury to try a highly publicized case. To require a defendant to make such a showing requires the defendant to prove beyond a reasonable doubt that he cannot get a fair trial in the county. Ji argues that if there is evidence there is a likelihood the defendant cannot obtain a fair trial, this should be sufficient.

The determination of whether to change venue lies within the sound discretion of the trial court and will not be disturbed on appeal absent a showing of prejudice to the substantial rights of the defendant, with the burden upon the defendant to show prejudice in the community, not as a matter of speculation, but as a demonstrable reality. *State v. Haislip*, 237 Kan. 461, Syl. ¶ 12, 701 P.2d 909 (1985).

"The defendant must show that such prejudice exists in the community that it was reasonably certain he could not have obtained a fair trial. There must be more than speculation that the defendant did not receive a fair trial. The State is not required to produce evidence refuting that of the defendant. *State v. Sanders*, 223 Kan. 273, 280, 574 P.2d 559 (1977)." *State*

*v. Ruebke*, 240 Kan. 493, Syl. ¶ 3, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987).

Ji has failed to meet his burden.

18. Denial of Ji's motion for a new trial based on newly discovered evidence.

Ji filed a motion for new trial based on newly discovered evidence with two accompanying affidavits and exhibits. The motion stated that one of the State's witnesses had testified that Ji kept a large sign in his room (a room in California he had rented for two and one-half months prior to the Emporia shootings), which sign had the Chinese characters for the English words "Love", "Hate", "Patience", and "Revenge." Ji claims that, at trial, the State had contended that the defendant went to the Calvary Baptist Church for simple revenge and not to display his power over their God as he claimed. The newly discovered evidence was that the Chinese characters in Ji's room stood for the English words "Love", "Hate", "Patience", and *"Anger"* not *"Revenge."*

While the witness was testifying, defense counsel told the court the defendant disputed her testimony as to what was written. The trial judge advised defense counsel he could present rebuttal evidence if he chose to do so. The defendant did not rebut the testimony during the trial.

Ji argues that the trial court, without questioning the credibility of the affiants, found that the correct meaning of the Chinese characters was presented during trial. Defendant's counsel asserts he was not able to impeach the testimony because it was necessary for him to prepare for trial and he lacked the time to obtain an interpreter to determine the four Chinese characters and their English translation. On appeal, he argues if the words "revenge" and "hate" were not expressed in the Chinese characters, the State's theory that defendant intended his acts would be considerably weakened because the State never presented sufficient evidence to support the verdict.

In denying the motion, the court stated that defendant was present in court and readily understood the Chinese language. The judge observed if there was an error in the definitions of any of the words on the sign, Ji could have presented evidence of the proper definition while he testified during the trial. The

court further found the evidence was not critical to any of the basic issues and no prejudice resulted even if the translation of the word revenge was wrong. The judge determined the evidence would not have produced a different result upon trial and, therefore, denied the motion for a new trial based upon that newly discovered evidence.

The granting of a new trial for newly discovered evidence is in the trial court's discretion. A new trial should not be granted on the ground of newly discovered evidence unless the evidence is of such materiality that it would be likely to produce a different result upon retrial. The credibility of the evidence offered in support of the motion is for the trial court's consideration. The burden of proof is on the defendant to show the alleged newly discovered evidence could not with reasonable diligence have been produced at trial. The appellate review of an order denying a new trial is limited to whether the trial court abused its discretion. *State v. Redford*, 248 Kan. 130, 131-132, 804 P.2d 983 (1991); *Baker v. State*, 243 Kan. 1, 11, 755 P.2d 493 (1988). When the alleged newly discovered evidence merely tends to impeach or discredit the testimony of a witness on a collateral matter, a new trial will not be granted. 243 Kan. 1, Syl. ¶ 8.

The defendant has failed to show that the newly discovered evidence could not with reasonable diligence have been produced at trial or, if produced, would have produced a different result at trial if admitted.

19. Whether the *M'Naghten* Rule, as applied, denied Ji due process and equal protection of the law.

Ji argues the *M'Naghten* Rule should be rejected in favor of a more appropriate standard, such as the one proposed by the American Law Institute's Model Penal Code, which provides:

"Section 4.01 Mental Disease or Defect Excluding Responsibility.

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate· the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.

"(2) As used in this Article, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

Ji claims he was denied his right to a fair trial on the issue of his sanity and/or his true state of mind at the time of the incident because of the *M'Naghten* Rule. Ji asserts that the rule neither takes into consideration a person's belief that what he or she was doing was right even though the person knew the act is prohibited by state law, nor allows the jury to consider criminal intent without the question of insanity. Ji argues an insane defendant is incapable of understanding how important evidence concerning state of mind is and how it affects the varying degrees of a crime, such as homicide. Thus, an insane defendant is hampered by his illness and denied the rights accorded other similarly charged sane defendants. Ji argues he was, in effect, denied equal protection of the law.

In *State v. Smith*, 223 Kan. 203, 208, 574 P.2d 548 (1977), we considered the appellant's contention that the American Law Institute Model Penal Code definition of criminal responsibility should be adopted by the Kansas courts. We noted that although it is not scientifically perfect, the *M'Naghten* Rule is the best criteria yet devised for ascertaining criminal responsibility. We determined to retain the *M'Naghten* rule in Kansas because "no other test better protects society as well as serves its needs." 223 Kan. at 211. The *M'Naghten* Rule does not deny an insane defendant equal protection of the law. We again decline to adopt the American Law Institute Model Penal Code definition of insanity.

20. Refusal to instruct on voluntary manslaughter.

For a defendant charged with murder to be entitled to a jury instruction on voluntary manslaughter because the defendant acted in the heat of passion, defendant's emotional state of mind must exist at the time of the act and it must have arisen from circumstances constituting sufficient provocation. *State v. Guebara*, 236 Kan. 791, Syl. ¶ 2, 696 P.2d 381 (1985).

On appeal, Ji argues he was provoked by G.M.'s breaking off their relationship without explanation. He claims this act was an objective and real provocation to his deluded mind which he relived over and over. Once the act was integrated in his delusional system of belief, Ji argues, he had no choice but to take the action that he did. This argument was never presented to

the trial court. The defendant cannot raise an argument on appeal which is not presented to the trial court. *State v. Holley*, 238 Kan. 501, 508, 712 P.2d 1214 (1986).

What Ji did argue to the trial court was that he was upset or angry because he was unable to enter the locked front door of the church and was forced to go around to the back door to enter the church. The test of the sufficiency of the provocation to entitle a defendant to an instruction on voluntary manslaughter is objective, not subjective. The provocation, whether it be "sudden quarrel" or some other form of provocation, must be sufficient to cause an ordinary person to lose control of the person's actions and reason. In applying the objective standard for measuring the sufficiency of the provocation, the standard precludes consideration of the innate peculiarities of the individual defendant. *State v. Guebara*, 236 Kan. 791, Syl. ¶ 3. The trial court did not err in finding there was no evidence to warrant the giving of an instruction on voluntary manslaughter.

21. Whether Ji's sentence was unreasonable under the circumstances.

The court sentenced Ji to serve a mandatory life sentence for his conviction of first-degree murder and to serve not less than 10 years nor more than life on each of his 6 convictions for attempted first-degree murder. The court ordered all of Ji's sentences to run consecutively.

Ji claims the sentence was based on partiality, prejudice, oppression, or corrupt motive, and/or was unreasonable under the circumstances. Ji argues, without support from the record, that the court only considered society's right to exact vengeance or retribution on the lawbreaker and failed to consider his illness. He asserts his sentence exceeds that given whites who commit similar crimes. He claims the trial judge intended that the victims, church members, and the community feel avenged and relieved. Ji states the "carnival" atmosphere of the trial and the sentencing hearing influenced the judge to impose consecutive sentences without considering Ji's mental disorder and the need for treatment.

A sentence imposed by a trial court will not be disturbed on the ground it is excessive, provided it is within the limits pre-

scribed by law and within the realm of discretion on the part of the trial court, and the sentence is not the result of partiality, prejudice, oppression, or corrupt motive. *State v. Doile*, 244 Kan. 493, 503-04, 769 P.2d 666 (1989).

The court could have imposed a sentence of not less than 15 years nor more than life on each of the six counts of attempted first-degree murder. K.S.A. 21-4501(b) and K.S.A. 21-3301(c)(1). The sentences imposed were within the statutory limits. Defendant has offered only unsupported conclusory statements as a basis for this claim. Defendant has failed to show an abuse of discretion or that the sentence was the result of partiality, prejudice, oppression, or corrupt motive.

Finally, we have considered the following contentions of the appellant and conclude they are without merit because the defendant is unable to cite portions of the transcript to support the claim, the contentions are conclusory and without substantiation or reference to the record on appeal, or they are conclusory and request we overrule prior law and adopt the appellant's theory of the law:

1. The trial court committed prejudicial error in limiting or nullifying defense counsel's examination of prospective jurors.

2. The court committed harmful error in admitting hearsay evidence, *i.e.*, the Performance Progress Report of Ji's job performance while employed by the New York Health & Hospital Corporation.

3. The trial judge restricted defense counsel's opening statement by continual interruptions.

4. The court showed greater deference to the State than to Ji during the course of the trial, and this prejudiced the jury against Ji.

5. The court improperly restricted the defense expert from explaining to the jury the effect a conviction for first-degree murder would have on the defendant's mental condition.

6. The court erred in allowing the county attorney to argue with Ji and ask him repetitive questions during cross-examination.

7. The court erred in failing to instruct on other lesser charges requested by defense counsel.

8. The trial court's jury instruction on intent shifted the burden of proof on the issues of intent and insanity from the State to the defendant.

9. The jury instructions as a whole prejudiced Ji's right to a fair trial.

10. The court's interruption of defense counsel's closing argument prejudiced the jury.

11. Defense counsel was ineffective in failing to object to the closing argument of the State, and/or the county attorney inflamed or prejudiced the jury by improper remarks during his closing argument.

There is no doubt that Ji was suffering from delusions and felt he was being persecuted by the members of the Calvary Baptist Church. Even after he left Emporia in 1984 he believed that the people in Emporia were spying on him. Ji finally decided to travel back to Emporia to punish the members of the Calvary Baptist Church. He also believed if there were truly a Christian God that the bullets would be deflected and nothing would happen to the members of the church. If there were no Christian God, as he believed, the members of the church would be hurt. He believed that the members of the Calvary Baptist Church were criminals and he was morally justified in delivering their punishment. Ji admitted he was well aware of his actions and he realized what the consequences could entail but believed what he was doing was right.

Although Ji was suffering from delusions, he understood that he was charged with a crime, he knew the nature and the purpose of the proceedings against him, and he was capable of making or assisting in making his defense. In addition to understanding the nature of his acts, Ji knew that what he was doing was prohibited by law. Ji was neither incompetent to stand trial nor insane. Once Ji had completed his mission, it became his goal to espouse his views to the world. He knew the vehicle to publish his views was his trial. It was impossible for any of his court-appointed attorneys to deflect Ji from his charted course.

Affirmed.