NOT DESIGNATED FOR PUBLICATION

No. 125,388

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

STEVEN KYLE BRAINARD,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; BRUCE C. BROWN, judge. Submitted without oral argument. Opinion filed January 5, 2024. Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before MALONE, P.J., GARDNER and CLINE, JJ.

PER CURIAM:  Steven Kyle Brainard appeals his two convictions of aggravated criminal sodomy and aggravated indecent liberties with a child. He argues that the district court erred by denying his requests to remove a juror and to appoint new counsel. Brainard also raises a claim of cumulative error. Finding no error, we affirm.

1

*Factual and Procedural Background*

Brainard met E.A. (Mother) in Oklahoma several years ago; they eventually married and had two children together (S.B. and I.B.). Mother also had three older children (G.B., Jo.B., and J.B.) from a previous relationship. During Brainard and Mother's marriage, the family lived in several states before settling in Derby, Kansas. But after 12 years of marriage, Brainard and Mother divorced in April 2021 and later moved into separate houses. Brainard stayed in Derby, but Mother moved to Wichita with the children. She allowed all the children to stay with Brainard most weekends.

In August or early September, after a few months into this visitation agreement, Mother noticed that her daughter (I.B.) started making excuses to avoid staying with Brainard. I.B. would generally claim that she felt too sick to go. Although Mother did not force I.B. to go to Brainard's when she made these excuses, Mother would encourage I.B. to give Brainard a chance. I.B. eventually explained to Mother that she did not mind spending time with Brainard when her brothers were around, but she did not want to spend the night at Brainard's house.

Yet sometime in October, I.B. and S.B. stayed overnight with Brainard and without older siblings. When I.B. returned home, Mother noticed that she was not acting like herself. Mother asked I.B. what was wrong but I.B. did not respond. Seemingly in I.B.'s defense, S.B. made up an excuse for her behavior. Mother found S.B.'s excuse nonsensical.

A few days later, I.B. agreed to go to Brainard's for the day but told Mother she did not want to spend the night. Jo.B. and J.B. accompanied I.B. to Brainard's. Mother later called to tell I.B. that she needed to change their plan and that I.B. would need to spend the night at Brainard's. I.B. became emotional and told Mother that she did not want to do that. I.B. did not give a reason for her objection so Mother called S.B. to ask if

he knew what was wrong with her. S.B. told Mother that he had some idea why I.B. did not want to stay with Brainard but he did not want to talk about it over the phone. So Mother drove to speak to S.B. in person.

S.B. told Mother about two incidents involving I.B. and Brainard. First, he explained that I.B. and Brainard sometimes disappear together. Once, I.B. left what she was doing with S.B. to get a drink of water. When she had not returned after about 10 minutes, S.B. went into the house to find her. He found her crying while exiting a room with Brainard. When S.B. asked I.B. what happened, she refused to explain.

Second, S.B. said that when the family lived in Washington, he once left his room to find Brainard. He went downstairs and peeked around the staircase to check if Brainard was on the couch. S.B. then saw that Brainard had his penis pulled out of his pants and heard him telling I.B. to kiss it. S.B. said nothing and ran back up the stairs.

After learning this, Mother swiftly tried to locate and retrieve the children. She eventually learned that Brainard had taken I.B. to Walmart. When she got there, she took Brainard aside and confronted him with the information that S.B. had shared. Brainard became angry and denied the allegations.

Mother then took I.B. to the women's restroom to talk to her separately. I.B. initially denied that Brainard had done anything to her. But after Mother asked S.B. whether she was "telling . . . the truth the way God wants us to speak the truth," I.B. started crying and revealed that Brainard had sexually abused her. As I.B. continued to cry, Mother asked her several yes or no questions. Based on her responses, I.B. indicated that S.B. had told Mother the truth about what he had seen in Washington. I.B. also indicated that Brainard had "put his private to her private" and "near her face or her mouth."

3

Mother then drove I.B. and S.B. to a hospital for an examination, notifying police that they were on their way. During the examination, I.B. reported to the forensic examiner that Brainard had sexually abused her a couple of weeks earlier. The examiner visually inspected I.B. and found no wounds. And because I.B. declined additional examinations, the examiner did not swab I.B. for physical evidence.

While at the hospital, I.B. also spoke with a police officer. She reported that Brainard "had been putting his penis in her mouth and . . . vagina." I.B. said more about the abuse to a forensic interviewer the next day. S.B. also told an officer what he had seen in Washington.

*Pretrial Proceedings and Voir Dire*

The State charged Brainard with single counts of aggravated criminal sodomy and aggravated indecent liberties with a child.

During the district court's initial remarks to the prospective jurors during voir dire, one of them (Juror 30) stated that she did not speak English as her first language; she spoke Ukrainian and Russian. She also explained that she hesitated to act as a juror because she feared that she would not understand everything. The district court asked Juror 30 several questions about her language skills. And after considering her responses, including her demeanor, the district court found her removal unnecessary. The prosecutor and defense counsel addressed Juror 30 during the rest of voir dire and ultimately selected her as a jury member.

When the parties reconvened for trial the next day, Juror 30 notified the district court and the attorneys that as a young child and again as a teenager, she had twice been a victim of sexually violent crimes. The district court allowed the parties to ask Juror 30

4

more questions based on this new information. During that questioning, Juror 30 explained

- she had not disclosed her abuse earlier because when the district court first read the charges, she did not understand the type of crime Brainard was charged with;
- she may have understood more than half the information during voir dire, but she was not sure;
- as voir dire progressed, she came to realize what Brainard was accused of and decided that she needed to notify the parties about her past experiences; and
- her experiences would not affect her ability act fairly and impartially during Brainard's trial.

After counsel finished their inquiries, the district court heard arguments on her removal. Defense counsel acknowledged that Juror No. 30 "might be a model juror" in another case "because she clearly understands how the process should work when something happens." But defense counsel asked the court to remove Juror 30 based on "the language barrier" and because counsel did not believe, "despite what she [said] to the court," that she could be impartial here.

The district court told defense counsel that it would not rule on Juror 30's language comprehension because defense counsel had not lodged a timely objection during voir dire. Still, the district court made these findings and conclusion on the issue:

"[I]f anything, her comments this morning make it clear that it's not a significant issue at all. Her English is very good.

"Now, like a lot of Eastern European first language folks, she regularly leaves out certain English words, you'll see this . . . probably because they don't use those words in the native language. But it's clear she understands very well. And the[only] issue was when she first came in[,] . . . she described it . . . [as being] overwhelmed by . . . the process and the situation.

5

"The other thing is, you know, aggravated criminal sodomy, aggravated indecent liberties with a child, you bring in English first language folks and ask them what . . . that mean[s] and non-law trained folks will probably not have a . . . good idea. And she made it clear that . . . as the process went on, she understood everything. So it's not an issue, . . . nothing changed, there's nothing new[.] . . . So I [will not remove Juror 30] for that."

The district court also found that Juror 30 did not purposefully fail to disclose her past experiences sooner, and it accepted her testimony that despite these incidents, she would remain fair and impartial.

At the end of the trial, following closing arguments and before deliberations began, the district court held a sidebar to ask counsel whether they wanted to designate Juror 30 as the alternate juror. Yet both counsel declined this invitation and instead agreed to designate a different person as alternate.

*Trial*

At trial, I.B. testified that in August or September, she stopped wanting to go to Brainard's house because he started "sexually abusing [her]." She explained that when she stayed at Brainard's, she would usually sleep on the couch, in her old room, or in Brainard's room. And sometimes, when she shared a bed with Brainard, they did not wear clothes. I.B. also detailed the acts that Brainard committed against her.

In his testimony, Brainard denied doing "anything inappropriate" with I.B., exposing himself to her, having oral sex with her, touching her inappropriately, or sleeping in the same bed with her.

To attack I.B.'s credibility, defense counsel elicited testimony from Brainard, I.B., and Mother to indicate that I.B. had given an impossible timeline for the events she described. Brainard suggested that I.B. did not stay at his house every weekend or on

6

some dates within the timeframe that she claimed the abuse had occurred. And Brainard admitted some texts from Mother, showing that I.B. did not go to his house on one date (October 29) within the charged time frame.

Defense counsel's cross-examination of Mother tried to show that Mother had goaded I.B. into accusing Brainard. In closing, the defense contended that I.B. had initially denied any abuse to Mother, and that I.B. later agreed that the crimes had occurred only because Mother "put the fear of God into her."

Brainard also called two of Mother's older sons to testify. They stated that Brainard never acted inappropriately with them and that they had not seen Brainard do anything to I.B. On cross-examination, S.B. also testified that he never saw Brainard do anything to I.B. while they lived in Kansas, but he was 100 percent sure that he saw Brainard expose himself to I.B. in Washington.

The jury convicted Brainard as charged. The district court sentenced him to two concurrent terms of life in prison, with parole eligibility after 25 years. Brainard appeals.

*Did the District Court Err in Denying Brainard's Request to Excuse Juror 30?*

Brainard first challenges the district court's denial of his request to remove Juror 30, claiming that the district court based its decision on legal and factual errors. Brainard claims that Juror 30's statements about her ability to speak English established that she was not qualified to sit on the jury, yet the district court substituted its own opinion about her ability to understand the evidence, thus applying an erroneous legal standard when making its decision.

*Invited Error*

The State first asks us to dismiss Brainard's argument under the invited error rule. The State claims that by choosing not to designate Juror 30 as an alternate, Brainard invited the error that he now challenges.

Generally, a litigant may not invite an error and then challenge the error on appeal. *State v. Green*, 315 Kan. 178, 183, 505 P.3d 377 (2022). But cf. *State v. Sullivan*, 307 Kan. 697, 707, 414 P.3d 737 (2018) (invited error inapplicable to structural constitutional errors). There is no bright-line rule for the application of this doctrine. We must instead determine whether, based on the record, Brainard induced the district court to make the error that he now challenges. See *State v. Douglas*, 313 Kan. 704, 707, 490 P.3d 34 (2021).

Brainard's decision not to select Juror 30 as an alternate did not cause Juror 30 to be selected as a juror and his actions were not the but-for cause of Juror 30 staying on the jury. Brainard did not induce the district court to keep her on the jury. To the contrary, he asked the court to remove her from it and argued that position. The record thus does not establish that Brainard's actions caused the claimed error. Cf. *State v. Smith-Parker*, 301 Kan. 132, 166, 340 P.3d 485 (2014) (finding invited error doctrine inapplicable when appellant agreed with State's request to replace juror but did not make request himself).

Brainard may or may not have avoided the claimed error had he agreed to designate Juror 30 as an alternate. Even then, the district court may not have allowed her to serve as the alternate if the State had objected. And even had both parties agreed to choose her as the alternate, she could have served on the jury as a replacement. But the State does not argue waiver so we do not consider that doctrine. We instead consider the merits of Brainard's claim.

*Standard of Review and Basic Legal Principles*

The Sixth Amendment and section 10 of the Kansas Bill of Rights guarantee an accused the right to a fair and impartial jury. *State v. Miller*, 308 Kan. 1119, 1138, 427 P.3d 907 (2018). Voir dire is used to enable the parties to select jurors who are competent and without bias, prejudice, or partiality. *State v. Thurber*, 308 Kan. 140, 181, 420 P.3d 389 (2018).

K.S.A. 43-158(a) provides that persons unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out a jury questionnaire form must be excused from jury service. Juror 30 adequately filled out her jury questionnaire. Although Juror 30's juror questionnaire made the district court aware of her doubts about her English fluency, neither party contends that the district court violated this statute.

Our focus is thus on the district court's authority to excuse a person from jury service under K.S.A. 43-159. Subsection (a) of this statute authorizes the district court to excuse persons "so physically or mentally infirm as to be unequal to the task of ordinary jury duty." K.S.A. 43-159(a). Our Supreme Court has held that this rule requires a juror to understand English to a degree which allows the juror to fully comprehend the testimony and court instructions. See *State v. Pham*, 281 Kan. 1227, 1239, 136 P.3d 919 (2006); *State v. Ji*, 251 Kan. 3, 9, 832 P.2d 1176 (1992) (holding jurors must have reasonable knowledge of language in which proceedings are conducted to enable them to perform their duties and ensure defendant receives fair trial); *State v. Pratt*, 114 Kan. 660, 661, 220 P. 505 (1923) (holding potential juror "who cannot understand the language in which the business of the court is conducted, is as much disqualified to serve as a juror as though he were deaf, or had some other infirmity which made it impossible for him to participate intelligently in the business before the court").

9

Whether a person is qualified or competent to sit as a juror is a question for the district court, and we will not disturb the district court's ruling unless it is clearly erroneous or we find an abuse of discretion. *State v. Hayes*, 270 Kan. 535, 537, 17 P.3d 317, 319 (2001). Judicial discretion is abused if the ruling is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *State v. Levy*, 313 Kan. 232, 237, 485 P.3d 605 (2021). As the party asserting error, Brainard bears the burden of showing the abuse of discretion. *State v. Keys*, 315 Kan. 690, 708, 510 P.3d 706 (2022); *Miller*, 308 Kan. at 1138.

*Brainard Fails to Establish Error*

Brainard claims that the district court based its decision on both legal and factual errors. Citing *State v. Miller*, 11 Kan. App. 2d 410, 722 P.2d 1131 (1986), he argues that the district court replaced Juror 30's statements about her lack of English comprehension with the court's opinion on the matter, applying an incorrect legal standard. Brainard also asserts that the day after voir dire, Juror 30 stated that she had not understood some of the district court's opening remarks, contradicting the district court's finding that Juror 30 was able to understand the evidence.

In *Miller*, a juror notified the district court at the end of the first day of trial in an aggravated incest case that she had a hearing impairment and had not heard the two victims' testimony or the court reporter. Despite these admissions, the district court found that the juror was "overstating" her inability to hear critical testimony and questions. 11 Kan. App. 2d at 412. This court reversed, finding the district court abused its discretion by not discharging the juror for cause and, absent a waiver by the defendant, declaring a mistrial. 11 Kan. App. 2d at 413.

10

In making this determination, the panel considered both the district court's authority in ruling on jury selection matters and the appropriateness of disregarding a juror's assessment of their ability to hear:

> "Although a juror's competence is a matter for judicial determination, a juror's specific statement of such a factual matter, that is, what he or she could or could not hear, should control over a judge's opinion regarding the juror's ability to hear in the absence of some indication of insincerity or falsehood on the part of the juror." *Miller*, 11 Kan. App. 2d at 412.

Here, unlike in *Miller*, the district court made a factual finding that Juror 30 understood English sufficiently to allow jury service. See 11 Kan. App. 2d at 413 ("the trial judge did not make a finding that the juror could hear; he merely said he thought the juror had 'overstated'" her hearing disability). More importantly, the district court did not merely disregard Juror 30's statements and base its decision on its own unfounded opinion, as in *Miller*. Nor did the court substitute the juror's summary of her abilities for its own legal conclusion. Rather, after Juror 30 questioned her ability to sufficiently understand English, the district court properly inquired into the matter and allowed counsel to do the same. It then considered her responses before weighing the facts and deciding that she could serve as a juror.

Juror 30 showed her ability to understand spoken English by her conversations with counsel and the court. The district court began voir dire by informing the jury that the State had charged Brainard with single counts of aggravated criminal sodomy and aggravated indecent liberties with a child. The district court also asked several questions to confirm that each prospective juror met the necessary qualifications, including an ability to read and understand English. Juror 30 responded that English was her third language and that she worried about being unable to understand at trial. After a short discussion with Juror 30, the district court commended her English, stating she was

11

"speaking English extremely well." Juror 30 told the district court "I try, it's embarrassing, but I try."

The district court then asked about the amount of English that Juror 30 understood when speaking and when reading, her career, and how much she generally spoke English throughout the day. She reported that she understood "50/50," indicating that she understood half the words spoken to her. She stated that she could read English but was probably worse at reading than speaking. She had lived in the United States for the last 11 years and worked in retail for 10 of those years. She spoke English at work and had chosen her job in part because of her desire to improve her English skills. When addressing Juror 30 a second time, the district court asked about her family. She explained that she was married and had one child, and she explained where her husband worked.

After defense counsel asked whether any of the prospective jurors had had a "messy" breakup or divorce, Juror 30 explained that she had divorced her first husband due to "physical abuse." But she maintained that she was "[p]erfectly fine" with her ex-husband because they "have a daughter" together. The prosecutor asked Juror 30 about her familial or other ties to Ukraine and Ukraine's ongoing conflict with Russia. She explained that she still had family there, but she was not overly concerned about them and could speak with them every day if she wanted to.

Although Juror 30 estimated that she understood roughly half of what she heard in her interactions outside the courtroom, Juror 30 responded appropriately to the court's questions and demonstrated her ability to understand and discuss various topics. She explained that she regularly spoke English as a part of her long-held job in retail. She answered several questions from the prosecutor and defense counsel, discussing her current and past relationships, the circumstances of her divorce, and her familial and emotional ties to Ukraine and its ongoing political conflict with Russia. She also later

12

discussed the circumstances of the abuse that she had suffered and assured the district court that she could separate those experiences from her duty to remain fair and impartial when deciding Brainard's guilt. The record thus contains sufficient evidence supporting the district court's conclusion that Juror 30 was able to fully understand the trial testimony and instructions.

Brainard also asserts that Juror 30's statements the day after voir dire show that she had not understood the district court when it had read the charges against Brainard. Brainard does not challenge the district court's finding that Juror 30 did not purposefully conceal pertinent information by waiting until after voir dire to make her disclosure. We thus find this argument waived or abandoned. *State v. Davis*, 313 Kan. 244, 248, 485 P.3d 174 (2021) (issues not briefed are considered waived). Still, Brainard claims that Juror 30 admitted she did not understand important trial information.

The district court addressed this issue and determined that despite her initial confusion, Juror 30 confirmed that as the voir dire inquiry continued, she figured out what the charges entailed. The district court noted that non-law-trained prospective jurors may initially lack an understanding of what aggravated criminal sodomy and aggravated indecent liberties are, and that is true for native English speakers as well. And nothing in the record shows that Juror 30 did not understand the evidence or instructions at trial. Brainard essentially asks us to reweigh the evidence. Yet a reviewing court does not reweigh evidence, resolve evidentiary conflicts, or make credibility determinations of witnesses. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018). The record contains sufficient evidence supporting the district court's conclusion that Juror 30 was able to fully understand the trial testimony and instructions and was able to perform her duty as a juror sufficiently to ensure the defendant received a fair trial.

13

Because we find no clear error or abuse of discretion, we will not disturb the district court's ruling. *Hayes*, 270 Kan. at 537. We thus find it unnecessary to reach the parties' additional arguments about prejudice and affirm the district court's ruling.

*Did the District Court Err in Denying Brainard's Motion for New Counsel?*

In his next appellate claim, Brainard challenges the district court's denial of his pretrial motion to appoint new counsel.

*Additional Facts About Brainard's Motion*

Several months before trial, Brainard filed a motion for new counsel. The motion does not make any arguments against defense counsel specifically. In fact, the only time that the motion references Brainard's attorney is by allusion, in requesting that the district court "take notice of the amount of times [he] tried to get ahold [of] and contact" his attorney.

At the hearing on this motion, Brainard began by stating that while preparing for trial, defense counsel had reviewed texts between Brainard and Mother. This prompted a warning from the district court for Brainard to avoid disclosing confidential communications or evidence during the hearing. After this warning, Brainard explained that he disagreed with his attorney about whether the text messages should be used at trial. Brainard believed that the texts proved his innocence, but defense counsel did not believe that the texts would help his defense.

Defense counsel admitted that this disagreement existed and that they sometimes disagreed about what motions Brainard's case required. But he maintained that he had not prevented Brainard from contacting him and that he was available to speak with Brainard

14

any time. Counsel thus concluded that Brainard's motion failed to establish a conflict of interest, and that if Brainard believed that a breakdown in communication or an irreconcilable disagreement existed, counsel had not contributed to it.

After considering these arguments, the district court found that Brainard had shown no justifiable dissatisfaction with his attorney and denied his motion for new counsel. The district court also found that defense counsel had acted appropriately in weighing the strengths and weaknesses of Brainard's case when considering whether to present certain evidence.

Brainard filed a second motion for new counsel after trial, characterizing his attorney's performance as negligent or incompetent. As a part of this motion, Brainard reasserted his claim about the text messages. Brainard admitted in his motion that his counsel had explained his reasoning for not using the texts but still argued that failing to present them went against his wishes. The district court appointed substitute counsel to represent Brainard at a hearing on his post-trial motion. But by the hearing date, Brainard had withdrawn the motion. Because Brainard voluntarily withdrew his posttrial motion and he does not raise it as an issue on appeal, we will not review it. We consider any argument about the posttrial motion waived or abandoned. *Davis*, 313 Kan. at 248.

*Standard of Review and Basic Legal Principles*

We review the district court's decision about Brainard's pretrial motion for new counsel under an abuse of discretion standard. Again, Brainard bears the burden of proof. See *State v. Hulett*, 293 Kan. 312, 319, 263 P.3d 153 (2011); *State v. McGee*, 280 Kan. 890, 894, 126 P.3d 1110 (2006).

15

Defendants have a constitutional right to effective assistance of counsel but have no right to choose which attorney the court will appoint to represent them. *State v. Brown*, 300 Kan. 565, 574-75, 331 P.3d 797 (2014).

> "'[T]o warrant substitute counsel, a defendant must show "justifiable dissatisfaction" with appointed counsel. Justifiable dissatisfaction includes a showing of a conflict of interest, an irreconcilable conflict, or a complete breakdown in communications between counsel and the defendant. But ultimately, "[a]s long as the trial court has a reasonable basis for believing the attorney-client relation has not deteriorated to a point where appointed counsel can no longer give effective aid in the fair presentation of a defense, the court is justified in refusing to appoint new counsel."' [Citations omitted.]" *State v. Breitenbach*, 313 Kan. 73, 90, 483 P.3d 448 (2021).

The focus of a justifiable dissatisfaction inquiry is the adequacy of counsel in the adversarial process, not the accused's relationship with his attorney. *State v. Staten*, 304 Kan. 957, 972, 377 P.3d 427 (2016).

*No Error Shown*

Brainard's motion and argument at the hearing challenged defense counsel's performance based on allegedly limited communications and counsel's decision not to admit certain text messages at trial. We agree with the district court that these claims fail to show justifiable dissatisfaction.

To get relief, Brainard had to prove a conflict of interest, an irreconcilable disagreement, or a complete breakdown in communication between him and his counsel. See *Breitenbach*, 313 Kan. at 90. The closest that Brainard came to alleging a breakdown in communications was his written request that the district court "take notice of the amount of times [he] tried to . . . contact" his attorney. That cannot by itself meet his burden.

16

Brainard likewise failed to show an irreconcilable disagreement. Instead, the record establishes that as a part of his trial preparation, defense counsel made a strategic decision about which texts to admit at trial. Defense counsel admitted some of Brainard's text messages with Mother at trial to show that Brainard was not with I.B. on October 29—a date within the timeframe alleged in the State's complaint. Brainard suggests that other texts would have provided additional proof of his innocence but does not explain how. He also does not contend that defense counsel made anything other than a tactical decision in not submitting the texts at trial. And strategic and tactical decisions such as deciding what exhibits to offer at trial are to be made by defense counsel, who is not required to first consult the defendant. See generally *State v. Rivera*, 277 Kan. 109, 116-17, 83 P.3d 169 (2004) (finding criminal defendants are charged with deciding what plea to enter, whether to waive jury trial, and whether to testify, but strategical and tactical decisions like preparation, type of defense, and filing motions lie with defense counsel).

Brainard does not address these weaknesses in his argument but alleges that the district court's inquiry into his conflict with counsel was inadequate. Brainard claims that the prosecutor's presence at the hearing prevented him from discussing the details of specific text messages, so the district court should have excused the prosecutor to allow Brainard to speak more freely. But Brainard never asked the district court to do so. And he does not show any legal authority for his argument that the district court reversibly erred by failing to sua sponte order the prosecutor out of the courtroom. He likewise fails to explain what, if any, difference removing the prosecutor would have made. Although an abuse of discretion is established when a district court fails to ask about a stated potential conflict, Brainard failed to give "'an articulated statement of attorney dissatisfaction'" which would have triggered this duty. See *State v. Brown*, 300 Kan. at 575.

Brainard shows no abuse of discretion in the district court's decision to deny his pretrial motion for new counsel, so we affirm that decision.

*Does Cumulative Error Require Reversal?*

Finally, Brainard argues that the cumulative effect of his claimed trial errors deprived him of a fair trial and requires reversal. Multiple trial errors, when considered together, may require reversal of a defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. *State v. Alfaro-Valleda*, 314 Kan. 526, 551, 502 P.3d 66 (2022). But the cumulative error rule does not apply when there are no errors, as here. *State v. Gallegos*, 313 Kan. 262, 277, 485 P.3d 622 (2021).

Affirmed.